# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 1:25-MJ-158 |
| ELSHAN ZEYNALOV and MIRAGHA VALIYEV | ) ) ) | **UNDER SEAL** |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May 4, 2020 - June 3, 2021__ in the city/county of __Alexandria__ in the __Eastern__ District of __Virginia__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. §1349 | Conspiracy to Commit Wire Fraud |

This criminal complaint is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

Reviewed by AUSA/SAUSA

__Jordan Harvey, AUSA__
*Printed name and title*

*Complainant's signature*

__Michael Y. Jeng, FBI Special Agent__
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date: __03/07/2025__

*Judge's signature*

City and state: __Alexandria, VA__        Hon. William B. Porter, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ELSHAN ZEYNALOV<br>and MIRAGHA VALIYEV,<br><br>*Defendants.* | Case No. 1:25-MJ-158<br><br>**UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Michael Y. Jeng, being duly sworn, hereby, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2, 2017. Currently, I am assigned to a squad that investigates organized criminal enterprises and is based at the Washington Field Office – Northern Virginia Resident Agency in Manassas, Virginia. I have a bachelor's degree in political science, and a master's in security studies. I have primarily investigated violations of fraud and money laundering, such as online or telephonic scams, international money laundering, bank card skimming schemes, and aggravated identity theft.

2. I have investigated and assisted in the investigation of criminal matters involving violations of federal criminal statutes that involve financial institutions; the investigation of complex financial crimes, including extensive document review, document analysis, and witness interviews; and the preparation, presentation, and service of criminal complaints, arrest warrants,

1

and search warrants.

3. The facts and information contained in this affidavit are based on my personal knowledge of the investigation, my training and experience, the observations and reports of other law-enforcement officers, and information obtained from other agents, witnesses, and confidential sources. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge or all facts known to the United States about this investigation.

4. I make this affidavit in support of a Criminal Complaint charging ELSHAN ZEYNALOV ("ZEYNALOV") with violating 18 U.S.C. §§ 1028A (aggravated identity theft) and 1349 (conspiracy to commit wire fraud), and MIRAGHA VALIYEV ("VALIYEV") with violating 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

## PROBABLE CAUSE

5. Government Employees Insurance Company ("GEICO") is an American company that offers its customers a variety of insurance products, including automobile insurance. Customers can establish an automobile insurance policy with GEICO by submitting personal identification, vehicle, and payment information online. Once a policy is established, should the customer suffer damage to his or her insured vehicle, the customer can submit a claim and information to support that claim to GEICO. Customers can submit that information online and by speaking with GEICO representatives over the telephone. Claims can be made for funds to repair damage to the vehicle, reimburse lost wages suffered by not having access to the vehicle, pay for medical treatment incurred due to injuries suffered in a vehicle accident, and other reasons. Should GEICO deem the claim information sufficient, GEICO can issue payment in the form of a mailed

2

check or a direct deposit to the customer.

6. National General Insurance ("NGI") is another American company that offers a variety of insurance products, including automobile insurance. As with GEICO, NGI customers can also establish automobile insurance policies and make claims against those policies online and via telephone, and NGI can also issue payment in various ways.

7. In or about April 2021, representatives from GEICO met with law enforcement officers of the FBI, Homeland Security Investigations ("HSI"), the US Postal Inspection Service ("USPIS"), and the Fairfax County Police Department ("FCPD") to voluntarily share information on what appeared to GEICO investigators to be a group of individuals that were submitting false personal identification, vehicle, accident, and claim information to defraud GEICO of insurance payouts. In some instances, GEICO believed that stolen identities were used. Some of the alleged vehicle accidents are detailed further in this affidavit below.

### Accident #1 – May 4, 2020

8. GEICO provided information to law enforcement about an accident that allegedly occurred in Fairfax, Virginia, on or about May 4, 2020, between VICTIM 1 and CO-CONSPIRATOR 1 ("CC-1"). A GEICO automobile insurance policy had previously been created in VICTIM 1's name, and that policy covered VEHICLE 1, the vehicle involved in the alleged accident. A person claiming to be VICTIM 1 contacted GEICO, informed them of the accident, and said that he (VICTIM 1) was at fault for the accident.

9. VALIYEV was reportedly a passenger in CC-1's vehicle during this accident. CC-1 and VALIYEV submitted the following claims to GEICO for reimbursement:

 a. $16,140.62 to repair CC-1's vehicle.

3

  b. $9,888.00 in lost wages to CC-1.

  c. $6,915.00 in medical bills for treatment on CC-1 by a medical professional who resided and practiced in the Eastern District of Virginia, Co-Conspirator 2 ("CC-2"), for injuries sustained in this accident.

  d. $7,140.00 in medical bills for treatment on VALIYEV by CC-2 for injuries sustained in this accident.

10. In total, CC-1 and VALIYEV submitted $41,034.57 in claims to GEICO. GEICO remitted a check to CC-1 for $16,140.62 for vehicle repairs, and that check was later deposited into a bank account held in the name of CC-1. GEICO denied the remaining claims after further investigation led GEICO to believe this accident was fraudulent.

11. GEICO identified the real VICTIM 1, who resided in the Eastern District of Virginia, by his true name and true social security number, which had been provided to GEICO to establish the insurance policy online. GEICO fraud investigators conducted an examination under oath with VICTIM 1 in or about January 2021. VICTIM 1 informed GEICO that he never had an automobile insurance policy with GEICO, never owned or used VEHICLE 1, was not involved in an accident on May 4, 2020, and did not know anyone named CC-1 or VALIYEV. VICTIM 1 also confirmed that the name and social security number used to create the policy were his, but that the other identifying and contact information on the policy were not his. The FBI also interviewed VICTIM 1 in or about November 2022, who confirmed his responses to GEICO.

12. The FBI interviewed the true owner of VEHICLE 1 in or about November 2022, who stated that, since he purchased the vehicle in approximately 2018, it had not been involved in any car accidents. He also stated that he did not know VALIYEV, CC-1, or VICTIM 1.

4

13. GEICO's information showed that VICTIM 1's policy was created online on or about April 28, 2020, which was several days before the alleged accident. VICTIM 1 had a Google email address listed for this policy. Law enforcement sought information from Google about this email account, which showed that it was also created on or about April 28, 2020.

14. The first payment for VICTIM 1's policy was paid for using an American Express card ending in -6986. The initial payment to establish the policy was made on or about April 28, 2020, but after this no further payments were made. The investigation showed that this American Express card was a gift card with a preset amount, and that it was therefore not affiliated with any American Express account.

15. Law enforcement obtained information from Bank of America, which showed that the Internet Protocol ("IP") address used to create VICTIM 1's GEICO policy ("IP ADDRESS 1") was also used to access Bank of America accounts held in ZEYNALOV's and VALIYEV's names several times during 2020 and 2021.

16. On or about October 12, 2023, the FBI arrested CC-1 pursuant to an arrest warrant issued by the U.S. District Court for the Eastern District of Virginia (case number 1:23-MJ-190, signed by the Honorable Lindsey Vaala). The warrant charged CC-1 with violating 18 U.S.C. § 1343 (wire fraud). During his arrest, law enforcement seized CC-1's cellphone and subsequently obtained a warrant to search it (case number 1:23-SW-673, signed by the Honorable John F. Anderson).

17. A search by law enforcement of CC-1's cellphone revealed evidence that CC-1 and ZEYNALOV conspired to fabricate the May 4, 2020, accident, including the following:

   a. On or about April 27, 2020, CC-1 texted an image of American Express card -

5

       6986 and the information for VEHICLE 1 that was used to establish VICTIM 1's GEICO policy, including its make, model, year, and vehicle identification number, to a phone number whose contact name was "Elshan" in CC-1's cellphone (which is ZEYNALOV's first name).

    b. On or about April 28, 2020, ZEYNALOV texted an image of PERSON 1's completed GEICO automobile insurance policy card to CC-1.

18. Law enforcement interviewed CC-1, who confirmed that he and ZEYNALOV had submitted false information to GEICO for a number of false accidents, including the May 4, 2020, accident, for the purpose of defrauding GEICO. Specifically, ZEYNALOV created the GEICO policy in VICTIM 1's name using the American Express card and vehicle information provided -6986 as payment. CC-1 also stated that CC-2 was a medical professional that was willing to falsify treatment documentation for CC-1, ZEYNALOV, and their associates for the purpose of defrauding insurance companies.

19. Law enforcement interviewed CC-2, who admitted that he had an on-going relationship with CC-1, ZEYNALOV, VALIYEV, and their associates for years in which he would falsify medical treatment documentation to defraud automobile insurance companies. CC-2 received approximately 30% of the fraudulent insurance payments as a kickback for his services while the remaining 70% was paid to the individual that CC-2 was supposedly treating.

### Accident #2 – June 22, 2020

20. GEICO also provided information to law enforcement about an accident that allegedly occurred in Alexandria, Virginia, on or about June 22, 2020, between VICTIM 2 and VALIYEV. A GEICO automobile insurance policy had previously been created in VICTIM 2's

name, and that policy covered VEHICLE 2, the vehicle involved in the alleged accident. A person claiming to be VICTIM 2 contacted GEICO, informed them of the accident, and said that he (VICTIM 2) was at fault for the accident.

21. VALIYEV claimed to GEICO that he had a passenger in his vehicle as the time of the alleged accident: Co-Conspirator 3 ("CC-3"). VALIYEV and CC-3 submitted the following claims to GEICO for reimbursement:

   a. $10,111.21 to repair VALIYEV's vehicle.
   b. $1,930.68 for VALIYEV and CC-3 to rent a vehicle.
   c. $3,330.00 in medical treatment provided by CC-2 to CC-3 for injuries sustained in this accident.

22. In total, VALIYEV and CC-3 submitted $16,411.89 in claims to GEICO. GEICO remitted a check to VALIYEV for $10,111.21 for vehicle repairs, and that check was later deposited into a bank account held in the name of VALIYEV. GEICO also remitted a payment of $1,930.68 directly to the car rental agency. GEICO did not pay CC-3's medical claim after further investigation determined that this accident was likely fraudulent.

23. GEICO identified the real VICTIM 2, who resided in the Eastern District of Virginia, by his true name and true social security number, which were used to create this policy. GEICO conducted an examination under oath of VICTIM 2 in or about January 2021. VICTIM 2 stated that he had never owned or used VEHICLE 2, that he did not have an insurance policy with GEICO at the time of the June 22, 2020, accident, that he was not involved with this accident, and that he did not know anyone named VALIYEV or CC-3. VICTIM 2 also confirmed that the name and social security number used to create the policy were his, but that the other identifying and

contact information on the policy were not his. The FBI interviewed VICTIM 2 in or about October 2023, who confirmed the responses that he had given to GEICO.

24. GEICO's information showed that VICTIM 2's policy was created online on or about June 15, 2020, about a week prior to the alleged accident. The information showed that VICTIM 2's policy was also created with IP ADDRESS 1. GEICO's information showed that VICTIM 2's policy was created with a Google email address that, according to information provided by Google to law enforcement, was created on or about June 8, 2020. It also showed that VICTIM 2's policy was paid for by an American Express card ending in -9047. The initial payment for the policy occurred on or about June 15, 2020, but no more payments were made afterwards.

25. On or about February 28, 2024, the FBI executed a search warrant (case number 1:24-SW-129, signed by the Honorable Ivan D. Davis) on Apple for information pertaining to the iCloud account ZEYNALOVELSHAN@ICLOUD.COM, an account known to have been used by ZEYNALOV. In reviewing the results, law enforcement discovered evidence that ZEYNALOV, VALIYEV, and CC-3 conspired to defraud GEICO with claims regarding this alleged June 22, 2020, accident, which include the following:

    a. On or about June 15, 2020, ZEYNALOV received pictures via text message of American Express card -9047 from a number that law enforcement believes VALIYEV to have used. Approximately 30 minutes later, ZEYNALOV texted VALIYEV a picture of the GEICO insurance policy card for the policy in VICTIM 2's name. GEICO's information appeared to confirm that VICTIM 2's policy was created online during this time period.

    b. On or about August 26, 2020, ZEYNALOV texted VALIYEV an image of what

8

   appeared to be the screen of a mobile app that showed a claims payment of $10,111.21 for VALIYEV had been made via bank account transfer. The screen showed the GEICO claims number that this transfer was for, which was identical to the claim number that GEICO assigned to the June 22, 2020, accident, leading law enforcement to believe that ZEYNALOV had used GEICO's mobile app to monitor the status of VALIYEV's claim.

  c. Law enforcement found pictures of letters sent by GEICO and addressed to CC-3 in which GEICO requested information from CC-3 in order to fulfill claims submitted for the June 22, 2020, accident.

26. CC-1 also informed law enforcement that CC-3 had worked with ZEYNALOV in the past to submit false vehicle accident information to insurance companies to obtain fraudulent payments.

<u>Accident #3 – May 31, 2021</u>

27. NGI provided information to law enforcement regarding an accident that allegedly occurred on or about May 31, 2021, in Alexandria, Virginia. The accident allegedly involved PERSON 1, who was insured by NGI, and PERSON 2. On or about June 1, 2021, someone claiming to be PERSON 2 called NGI's claims department to report details of the accident. On or about June 3, 2021, someone claiming to be PERSON 1 called NGI to confirm the details of the accident and admitted to being at fault. Both PERSON 1 and PERSON 2 said that no police were called to the scene to take a report. PERSON 2 submitted a claim for $5,832.99 for damages to his vehicle, which NGI paid in the form of a check.

28. Law enforcement conducted research on open source and government databases,

and found no evidence that PERSON 1 was a real person. HSI conducted research on government databases on PERSON 2, which appeared to indicate that he was not in the United States at the time of this accident.

29. NGI recorded the calls with PERSON 1 and PERSON 2 referenced above, and provided them to law enforcement. In reviewing the calls, law enforcement noted that PERSON 1's voice appeared to be identical to CC-1's voice, which law enforcement was familiar with due to the arrest and debriefing of CC-1.

30. When reviewing the contents of CC-1's phone, law enforcement discovered a text message that CC-1 received on or about June 1, 2021, from a number that law enforcement believed ZEYNALOV to have used. The message was a screenshot that showed PERSON 1's name, date of birth, make, model, year, and color of the vehicle he supposedly was driving during the May 31, 2021, accident, his address, phone number, and a description of the accident. Law enforcement noted that portions of the accident description appeared to match almost word-for-word portions of PERSON 1's verbal description of the accident during the recorded call to NGI on or about June 3, 2021.

31. Law enforcement also found on CC-1's phone a picture of the check that NGI issued to PERSON 2 for his claim. CC-1 had texted this picture to ZEYNALOV on or about June 21, 2021.

32. Law enforcement obtained information from Citibank for an account held in PERSON 2's name. It showed that NGI's check had been deposited into this account on or about June 25, 2021, at a Citibank automated teller machine ("ATM"). Citibank provided an image of this deposit from the ATM's surveillance system, which appeared to show that ZEYNALOV

10

conducted the deposit. Law enforcement was able to recognize ZEYNALOV by comparing the ATM image to ZEYNALOV's Virginia Department of Motor Vehicle driver's license photograph.

33. Law enforcement reviewed contents of ZEYNALOV's iCloud account and located a picture of a notebook page that contained PERSON 2's name, address, and telephone number, which matched the information depicted in the screenshot that CC-1 had received from ZEYNALOV.

34. As part of his cooperation with law enforcement, CC-1 admitted that he and ZEYNALOV had fabricated this accident for the purpose of defrauding NGI. As part of his role in the scheme, CC-1 had called NGI posing as PERSON 1. CC-1 confirmed to law enforcement that the text message with details of the accident that he had received from ZEYNALOV was meant to be a script for him to read while on the phone with NGI. CC-1 also stated that PERSON 2 was a former associate of theirs that had departed the United States prior to this accident occurring. ZEYNALOV had kept PERSON 2's identifying information and used it after PERSON 2's departure for various reasons, including for the purpose of submitting false claim information to insurance companies. Finally, CC-1 listened to a portion of the recorded call between PERSON 2 and NGI and confirmed that PERSON 2's voice was really ZEYNALOV's.

## Accident #4 – June 2, 2021

35. GEICO provided information to law enforcement about an accident that allegedly occurred on or about June 2, 2021, in Bethesda, Maryland, between PERSON 3, who had a GEICO policy, and a parked vehicle registered to COMPANY 1, a company owned by CC-1. PERSON 3 submitted a claim for $809.04 to repair damages to his vehicle, while COMPANY 1 submitted a claim for $13,461.72 for damages to its vehicle. GEICO denied the claims after its investigation

determined that a claim had been submitted to another insurance company in or about December 2020 for PERSON 3's vehicle, and that the damages reported in this claim appeared to be identical to the damages supposedly suffered in the June 2, 2021, accident.

36. GEICO's information showed that PERSON 3's policy was created on or about April 6, 2021. It was paid for by American Express cards ending in -0479, -4192, and -9067, with payments on or about April 6, 2021, and May 5, 2021. No more payments were received afterwards. The contact information for the policy included a Google email address that, per information provided by Google to law enforcement, was created on or about April 5, 2021.

37. PERSON 3's policy was accessed online on or about June 1, 2021, and June 2, 2021, by an IP address that was serviced by Verizon ("IP ADDRESS 2"). Information provided by Verizon showed that IP ADDRESS 2 was registered to PERSON 2 during the time after PERSON 2 had departed the United States. As stated in paragraph 34 above, CC-1 reported to law enforcement that ZEYNALOV had kept PERSON 2's identifying information and used it after PERSON 2's departure for various purposes. This IP address was also found to have been used to access various bank accounts online that were held in CC-1's and COMPANY 1's name.

38. GEICO recorded several telephone calls that it had with the person claiming to be PERSON 3 as they discussed his claims. GEICO provided those recordings to law enforcement. Law enforcement noted that PERSON 3's voice appeared to be identical to CC-1's.

39. Law enforcement conducted research on open-source and government databases and found no evidence that PERSON 3 was a real person.

40. A search of CC-1's cellphone showed evidence that CC-1 and ZEYNALOV conspired to fabricate the June 2, 2021, accident, including the following:

12

    a. CC-1 received a text message on or about June 3, 2021, from ZEYNALOV that contained PERSON 3's name, date of birth, home address, and email address as it appeared on PERSON 3's GEICO policy.

    b. On or about July 2, 2021, CC-1 sent a text message containing GEICO's claim number for this accident to ZEYNALOV. On or about the same day, ZEYNALOV texted a screenshot of GEICO's website. The screenshot stated, in part, "Hello PERSON 3, welcome to your claim dashboard. Let's continue working on your claim." The screenshot also included GEICO's claim number for this accident.

41. A search of ZEYNALOV's iCloud account also showed evidence of his involvement with this claim. They include the following:

    a. A picture of a notebook page that showed PERSON 3's name, date of birth, home address, and email address as it appeared on PERSON 3's GEICO policy.

    b. Images of American Express cards -9067 and -4192.

42. CC-1 confirmed to law enforcement that he and ZEYNALOV conspired to fabricate the June 2, 2021, accident for the purpose of defrauding GEICO. ZEYNALOV had created PERSON 3's GEICO policy and CC-1 submitted information to GEICO for the claims.

### Accident #5 – June 3, 2021

43. GEICO provided information to law enforcement about an accident that occurred on or about June 3, 2021, in or around Alexandria, Virginia between, PERSON 2 and PERSON 4. PERSON 4 had a GEICO policy for his vehicle, VEHICLE 3. PERSON 2 submitted a claim for $4,142.48 for damages to his vehicle, which GEICO denied because its investigation led it to

believe this accident was fraudulent.

44. PERSON 4's policy was created on or about April 18, 2021. The email address used for this policy was serviced by Google, and, according to information provided by Google to law enforcement, was also created on or about April 18, 2021. GEICO provided information to law enforcement that showed that IP ADDRESS 2 had been used to access PERSON 4's policy online on or about June 1, 2021, and June 2, 2021.

45. Law enforcement conducted research on open-source and government databases, and found no evidence that PERSON 4 was a real person. Information provided by HSI appeared to indicate that PERSON 2 was also not in the United States at the time of this accident.

46. PERSON 4's policy indicated that he resided in an apartment building in Manassas, Virginia. The FBI obtained information from the company that managed this building that confirmed it had no records of PERSON 4 ever residing there.

47. Law enforcement interviewed the true owner of VEHICLE 2 in or about November 2022, who stated that he had purchased the vehicle in about April 2021 and sold it in about February 2022. He confirmed that he had never driven his vehicle to Virginia and was not involved in the June 3, 2021, accident.

48. GEICO provided law enforcement with a recording of a call it had with a person claiming to be PERSON 2 regarding this accident. PERSON 2's voice appeared to be identical to that which CC-1 had identified as belonging to ZEYNALOV's. GEICO provided law enforcement with a recording of a call it had with an individual who identified himself as "Tom" and who was a "friend of PERSON 2's." Tom had called GEICO on behalf of PERSON 2 with regards to this accident. Law enforcement listened to this call and noted that Tom's voice appeared to be identical

14

to CC-1's.

49. When reviewing CC-1's cellphone, law enforcement found a text message that CC-1 had sent to ZEYNALOV on or about June 4, 2021. The message contained PERSON 4's name, date of birth, home address, email address, and VEHICLE 2's year, make, and model as they appeared on PERSON 4's GEICO policy. Law enforcement also found a text message that ZEYNALOV had sent to CC-1 on or about June 14, 2021, that showed a screenshot of GEICO's website. The screenshot showed an "estimated repair cost" of $4,142.48, which was the same amount of the claim that PERSON 2 had submitted to GEICO.

50. When reviewing ZEYNALOV's iCloud, law enforcement found a picture of a notebook page that contained information relevant to this accident. This included PERSON 4's name, date of birth, home address, telephone number, email address, and VEHICLE 2's year, make, model, and vehicle identification number as they appeared in PERSON 4's GEICO policy.

51. As part of his cooperation with law enforcement, CC-1 admitted that he and ZEYNALOV had fabricated this accident to defraud GEICO.

15

## CONCLUSION

52. Based on this information, I respectfully submit that this affidavit supports probable cause to charge ELSHAN ZEYNALOV ("ZEYNALOV") with violating 18 U.S.C. §§ 1028A (aggravated identity theft) and 1349 (conspiracy to commit wire fraud), and MIRAGHA VALIYEV ("VALIYEV") with violating 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

Michael Y. Jeng
Special Agent
Federal Bureau of Investigation

Reviewed by: AUSA Jordan Harvey

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 this 7th day of March 2025.

The Honorable William B. Porter
United States Magistrate Judge